DECISION
Before this Court is an appeal by Mark and Yolonda Lariviere d.b.a. Yolonda's Pet Sitting Errand Service (hereinafter "Mr. and Mrs. Lariviere" "Yolonda's Pets" or collectively "Appellants") from a decision (hereinafter "Decision") of the Town of Cumberland (hereinafter "Town") sitting as the Zoning Board of Appeals. (hereinafter "Board"). That Decision affirmed a Cease and Desist Order issued to Appellants to halt business operations at their home address by the Town's Building and Zoning Officer (hereinafter "Zoning Officer"). Jurisdiction is pursuant to G.L. 1956 § 45-24-69.
 Facts and Travel
Per the Town of Cumberland Zoning Ordinance (hereinafter "Zoning Ordinance") Appellants' property is located in an R1 zoning district. An R1 district is described in the Zoning Ordinance as follows:
 "One-Household Low Density District. This zoning district is intended for low density residential areas comprised of single dwelling unit structures located on lots with a *Page 2 
minimum land area of 25,000 square feet for areas served by sewer and water; 40,000 square feet for areas, served by either sewer or water but not both; and 80,000 square feet for areas not served by neither both sewer and nor water."
This matter arises from the Cease and Desist Order issued on January 15, 2009 to the Appellants by the Town's Zoning Officer. The order was issued after town officials discovered that the Appellants were operating a pet sitting, kennel-like business at their home located at 1 Laurel Lane, Cumberland, Rhode Island. Appellants appealed the Cease and Desist Order, and the matter was heard before the Cumberland Zoning Board of Appeals on March 11, 2009.
The record indicates that Mrs. Lariviere first obtained a business certificate from the town in November of 2002. (Business Certificate, November 4, 2002). That certificate specifically states that "no business will be conducted at this address other than phone and computer." Id. According to Appellants' attorney, that language was added to avoid having "cages in the home, or runs, but [to ensure] a home-like setting in which dogs could come to the house." (Tr. at 6.) Further, the attorney explained that "after three years of successfully running this business . . . [,] the Larivieres decided to construct an addition."Id. During all of the "inspections and things of that nature, the animals were in the home," and no officials objected or remarked on that fact. (Tr. at 7.) Furthermore, the record indicates that the Larivieres applied for and received another business certificate in 2007 for the same business operation. (Business Certificate, November 30, 2007.)
In spite of, what they interpreted as an approval to operate, the Larivieres received the Cease and Desist Order letter on January 15, 2009. The letter informed the *Page 3 
Appellants that they were in violation of the November 4, 2002 Business Certificate and the Zoning Ordinance. (Cease and Desist Order, January 15, 2009.) Furthermore, the Cease and Desist Order reminded the Appellants that prior to receiving the 2007 Business Certificate, the Zoning Official and Mrs. Lariviere discussed the fact that "she would conduct business at the client's home only." Id.
To counter the allegation contained in the Cease and Desist Order, in his argument before the Board, Appellants' attorney posited the argument that because of the Town's knowledge, and in his view, approval of the Larivieres' business operation, the Town should be estopped from shutting down Yolonda's.
The first to offer sworn testimony before the Board, Mrs. Lariviere began by explaining that she had been conducting her in-home pet-sitting business from "November 2002 to November 2009." (Tr. at 26.) She described that her business was a "full service operation." In addition to boarding pets in her home she also, through the services of an assistant, offers pet-sitting services on site, in the homes of her clients. (Tr. at 27.) The reason for starting her own business was the fact that she had been diagnosed with a degenerative eye disease, and since "[she] was losing her vision . . . [she] start[ed] something in her home, so [she] would always have income coming in. . . ." Id. According to Lariviere, dogs boarded on the property stayed anywhere from a few hours to up to seven nights. (Tr. at 28.) They would utilize her fenced-in back yard for exercise and other needs. Id.
She informed the Board that in 2005, she and her husband added an 860 square foot addition to the home. That addition includes things dedicated to the business such as "office space and closets for food and stuff like that." (Tr. at 30.) She later testified that *Page 4 
she sought to obtain a second business certificate, because she was uncomfortable in relying on, what she deemed "the verbal permission" that she received when obtaining the first certificate back in 2002. (Tr. at 36.) The second permit was to protect her investment in building the addition and in light of the complaints she was receiving from her next door neighbors. Id.
Next to testify was Raymond Madden, the Zoning Official who issued the business certificate in November of 2007. He testified that when he issued the 2007 certificate, he "had a long discussion about the nature [of her business]." (Tr. at 39.) The certificate indicates the type of business as "Pet Sitting — in home — Yours or Mine." (Business Certificate, November 4, 2007.) Despite the phrase, Madden claimed that "he told her that she could not have animals in her home." Id. He claimed that Mrs. Lariviere explained to him that "she was doing a lot of work for, you know, local people in the neighborhood and that she would walk dogs during the day."Id. Lariviere informed Madden that the reason for obtaining the certificate was her desire to "have the ability just to be able to stop by her house, check her messages, put a little wash in, what have you, and then go about her business and go back to the client's homes." (Tr. at 40.) He further testified that he "opened the zoning code and showed [her] the pages [outlining the restrictions]. (Tr. at 41.)
When asked, Madden responded that he had not looked at the 2002 certificate and its associated file, but that he only verified that she had obtained an earlier certificate. (Tr. at 42.) He also testified that Lariviere never informed him that she planned on keeping dogs overnight. (Tr. at 46.) Madden only became aware of that fact, "once [he] got a complaint from one of the neighbors." (Tr. at 46.) Moreover, Madden claimed that *Page 5 
another town official, identified as Mr. Runge, who was tasked with conducting inspections pursuant to the additions put on the Larivieres' home, had informed Madden that he did not notice anything that could have been deemed a pet-sitting operation and just remarked that there were "a couple of little dogs that were over there . . . nothing uncommon. . . ." (Tr. at 49.)
Paul Rose, formerly an animal control official for the Town, testified next. He stated that sometime in the year 2005, Mrs. Lariviere came "into [his] office and asked about opening a boarding facility in her home." (Tr. at 51.) According to Rose, he informed her that he could not grant such permission and that "because she wanted to board animals for a fee, she would have to go to the Town and obtain a business license, and [he had] suggested to her that she should contact the State Veterinarian's office . . . [as] she would come under their rules of inspection. . . ." (Tr. at 52.) He also testified that he did not necessarily consider Yolonda's Pet Center a kennel. In his opinion, a kennel "contained cages and runs . . . but a "doggy day-care" was somehow different. (Tr. at 52-53.) However, he also testified that if it were a routine practice to keep dogs overnight for an extended period of time, then that would seem more like a kennel than a "doggy day-care." (Tr. at 55.)
The next witness before the Board was James Cribben. Mr. Cribben resided near the Pet Center, and in his opinion, the Larivieres were, in fact, operating a kennel out of their home. (Tr. at 57.) He noted five separate advertisements in the Providence Journal
where the Pet Center is listed as a kennel. (Tr. at 57.) According to Cribben, back in 2002 when the Larivieres first began operations, the business was run "out away from the home in other people's homes. She went to your house and took care of your dog." (Tr. at 58.) *Page 6 
However, things changed when the addition was added in 2005, and a "six-foot stockade type fencing" was added.[1] Id. "That's when the character of the business changed from an outside business to an in-house kennel[]. . . ." Id. On any given day, Mr. Cribben testified that he can look out and "notice six dogs in the yard . . . the dogs just run free." (Tr. at 61.)
Following the testimony of Mr. Cribben, the Board heard from three more abutters-Stanley Cyganiewicz, Edward McCormick and Scott Miller-all of whom agreed with the testimony of Mr. Cribben and described the operations at One Laurel Lane, as a kennel. (Tr. at 69-71.) In particular, Mr. Miller testified that barking can be heard well into the night, and that the yard is full of dogs during the day. (Tr. at 73.)
Upon the conclusion of testimony, the Board voted to unanimously deny the Larivieres' appeal and to sustain the Zoning Official's decision to issue the Cease and Desist Order. In its formal written decision issued on April 21, 2009, the Board held that there were "no facts justifying the issuance of any kind of permission to run this business." (Decision at 2.) Moreover, it noted this could not be classified a home occupation under the Zoning Ordinance as "it exceeds the specific limits of a home occupation under § 5-1(e). Id. Appellants appealed. *Page 7 
 Standard of Review
The Superior Court's review of a zoning board's decision is governed by § 45-24-69(d), which provides:
 The court shall not substitute its judgment for that of the zoning board of review as to the weight of the evidence on questions of fact. The court may affirm the decision of the zoning board of review or remand the case for further proceedings, or may reverse or modify the decision if substantial rights of the appellant have been prejudiced because of findings, inferences, conclusions, or decisions which are:
 (1) In violation of constitutional, statutory, or ordinance provisions;
 (2) In excess of the authority granted to the zoning board of review by statute or ordinance;
 (3) Made upon unlawful procedure;
 (4) Affected by other error of law;
 (5) Clearly erroneous in view of the reliable, probative, and substantial evidence of the whole record; or
 (6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.
The Court's review of the Board's decision is not de novo.See Monroe v. Town of East Greenwich,733 A.2d 703, 705 (R.I. 1999) (recognizing "traditional judicial' review standard that is applied in administrative-agency actions"). Instead, its appellate review is limited to an examination of "evidence presented [in an effort to determine if] the Zoning Board acted properly." Almeida v. Zoning Board of Review of the Town ofTiverton 606 A.2d 1318, 1322 (R.I. 1992) (upholding the a zoning board's affirmation a building official's issuance of a cease and desist order). Substantial evidence has been defined as "such relevant evidence that a reasonable mind might accept as adequate to support a conclusion, [or an] amount more than a scintilla but less than a preponderance." Lischio v. Zoning Bd. of Reviewof North Kingstown, 818 A.2d 685, 690 (R.I. 2003) (quotingCaswell v. George Sherman Sand and Gravel Co.,424 A.2d 646, 647 (R.I. 1981)). *Page 8 
In reviewing the decision of a zoning board this Court "lacks the authority to assess witness credibility or to substitute its judgment for that of the hearing judge concerning the weight of the evidence on questions of fact." Liberty Mutual InsuranceCo. v. Janes, 586 A.2d 536, 537 (R.I. 1991)). Should the Court find that competent evidence exists in the record to support the Board's findings, its decision must be affirmed. Monroe,733 A.2d at 705.
 Analysis
Appellants argue that the Board's decision was clearly erroneous based on the reliable, probative, and substantial record evidence; characterized by abuse of discretion; and in violation of statutory provisions. Specifically, Appellants contend that the Town's acquiescence to a business which operated for almost seven years estops it from ordering operations to cease. They contend that evidence of that acquiescence-the two business certificates, the fact that building officials who had been on the property and witnessed the operations failed to make any mention of the activity, and the financial detriment stemming from Appellants being forced to cease operations of Yolonda's Pet Center — satisfies the elements for estoppel. Accordingly, Appellants maintain that the Board's Decision should be overturned and the Cease and Desist Order vacated.
This Court is mindful that estoppel "may be invoked against a government agency where appropriate circumstances so require."Loiselle v. City of East Providence,116 R.I. 585, 359 A.2d 345 (1976). With respect to estoppel, our Supreme Court has explained:
 "the indispensable elements of estoppel are, first, an affirmative representation or equivalent conduct on part of *Page 9 
a person against whom estoppel is claimed which is directed to another for purpose of inducing the other to act or fail to act in reliance thereon and that such representation or conduct in fact did induce the other to act or fail to act, to his injury." Lichtenstein v. Parness, 81 R.I. 135, 138, 99 A.2d 3, 5 (1953).
However, to prevail with an estoppel claim, the Appellants must show that the Town's conduct rises to the level required in meeting the elements of estoppel.
Appellants contend that the two business certificates received from the Town in 2002 and 2007, and the dog sitting operations of Yolonda's, which were in plain view to a town official while conducting inspections pursuant to the 2005 addition, more than satisfy the first prong of equitable estoppel. Furthermore, Appellants note that their reliance on the income from the business and the decision to expand the business by constructing the addition clearly demonstrate their reliance on the Town's "affirmative representations or equivalent conduct." This Court disagrees.
The Town issues business certificates in accordance with G.L. 1956 § 6-6-1 of the General Laws. That section mandates that persons desiring to "conduct or transact business under any assumed name . . . must file in the office of the town or city clerk. . . ." In addition to § 6-6-1, § 8-3 of the Town's Ordinance mandates that those persons registering a business in Cumberland "state the nature of their business" . . . on said license or certificate.
The original 2002 business certificate directly notified Appellants that they were forbidden from boarding animals in their home. The certificate reads: "no business shall be conducted at this address other than phone and computer." (Business Certificate, November 4, 2002.) If Appellants boarded animals or conducted any kind of pet sitting *Page 10 
operation out of their residence, they would be acting in contravention of the 2002 business certificate, and thus such activities would not constitute an affirmative representation or an "explicit instruction . . . justify[ing] a holding that the [Town] [is] equitably estopped" from enforcing the Cease and Desist Order.McNulty v. City of Providence 994 A.2d 1221, 1225 (R.I. 2010) (holding that the failure of a city clerk to inform plaintiff of the relevant statute of limitations does not meet the first prong of estoppel).
The second business certificate issued in 2007 also fails to meet estoppel's first prong. While the form does read "Pet Sitting-In home-Yours or Mine" on the line marked "Type of Business," the language was written in by Mrs. Lariviere and seems more like a company name which could be construed at most, as a vague and ambiguous description of the proposed activities. Under either interpretation, it is in no way a stamp of approval by the Town for the Larivieres to conduct pet sitting operations at their home. Importantly, any ambiguity surrounding the form was squelched when Mr. Madden, the building official who signed the form, responded to the Board's questions by stating, "[s]he was told outright not to do that." (Tr. at 45.) He also testified under oath that he "opened up the zoning code" in an effort to show her, legally, why such operations were not allowed. (Tr. at 46.)See Providence Teachers Union v. ProvidenceSchool Board, 689 A.2d 388, 391 (R.I. 1997) (holding that a school board could not be estopped from denying a contract's validity when it had, at an earlier date, expressly rejected it).
The cases Appellants rely on in support of their claim of estoppel are misplaced. For instance, in Town of Glocester v. Olivo'sMobile Home Court, Inc. 111 R.I. 120, 300 A.2d 465 (1973), the court held that Glocester was estopped from denying petitioner a *Page 11 
right to operate a mobile home park. Specifically, the Court noted that despite the allegation from Glocester that petitioner had failed to obtain, in 1965, a valid mobile home park operator's license, it had "throughout a period of several years [following 1965], continued to accept [petitioner's] license-fee payment . . . and continued to renew the license [it claimed he had never received]. . . ." Id. at 131, 300 A.2d at 471. InGreenwich Bay Yacht Basin Associates v. Brown,537 A.2d 988 (R.I. 1988), petitioner, attempting to construct a vast waterfront development, filed for judicial relief, when at the last minute, an agency subcommittee of the Coastal Resources Management Council informed petitioner that its intention was to apply a newer, more stringent set of criteria in reviewing petitioner's plans for development. The Rhode Island Supreme Court found that the agency, because of "repeated assurances to [petitioner] that its application would be judged and processed in accordance with [a prior and more favorable] program," could be estopped from utilizing the updated more stringent program. Id. at 990, 993.[2] Clearly, a town's decision to accept fees and renew a proprietor's license to operate, as well as an agency's repeated and direct assurances by authoritative agency members, constitutes "affirmative representation[s] or equivalent conduct on part of a person against whom estoppel is claimed" in contrast to the facts herein.Lichtenstein supra.
Contrarily, the allegation of an isolated incident of a building official being on the premises of their home for a construction inspection and who may have seen pets habitating, and failed to admonish or report the Appellants hardly qualifies as an *Page 12 
affirmative representation. This incident would not be of the type "which the [Town] would reasonably expect to induce action or forbearance of a definite and substantial character on the part of [Appellants] and which did induce [Appellants to commence or continue their pet sitting operation]." General AccidentInsurance Co. v. American Nat'l Fireproofing, Inc.,716 A.2d 751, 756 (R.I. 1998) (citing Criterion Leasing Group v.Gulf Coast Plastering and Drywall,582 So.2d 799, 800 (Fla. App. Dist. Ct. 1991)). There are not enough facts in the record to indicate what the building official may or may not have witnessed at the times when he was there for the construction inspections. Furthermore, Appellants have failed to allege that the particular Town official conducting the inspection had any kind of duty to enforce the relevant zoning ordinances. Therefore, along with the evidence of the two building certificates, the alleged silence of the Town building official also fails to meet the first prong of estoppel. See PersonalFinance Co. of Providence v. Henley Kimbell Co.,61 R.I. 402, 1 A.2d 121, 125 (1938) (holding that silence can equal a claim for estoppel only when it is proven that there is a duty to speak and make facts known on the part of the party against whom estoppel is alleged).
The reliable, probative and substantial evidence of record — including the direct language on the 2002 business certificate and the testimony of the building official who informed Mrs. Lariviere that pets were not allowed on the property — does not meet the first elements of estoppel — the affirmative representations or equivalent conduct. Accordingly, the Board's decision to uphold the Cease and Desist Order is not clearly erroneous or affected by error of law. *Page 13 
This Court, for purposes of discussion further notes that assumingarguendo, that the elements for estoppel were present in this matter, any illegal activity conducted out of their home by the Appellant would nonetheless be in contravention of the ordinances. "[E]stoppel cannot be applicable when the municipality's acts were clearly ultra vires." Tech. Investors v. Town ofWesterly, 689 A.2d 1060, 1062 (R.I. 1997). Put more simply, relief will not be granted, even when a town official induces reliance action, if the induced action is in contravention of relevant ordinances. As an example, in Town of Charlestown v.Beattie, 422 A.2d 1250 (R.I. 1981), a claim of estoppel against a municipality trying to validly enforce its zoning code was denied even where it was factually determined that the town building official had induced reliance on the part of petitioner by issuing a building permit for alteration of a structure from a single family use to a multi family use. Because the relevant municipal ordinance forbade the construction of multi-family dwellings in that particular zone, the act of the building official, [granting the permit] [could] not vitiate the town's right to have the zoning violations enjoined." Id. at 1252; see also Town ofJohnston v. Pezza, 723 A.2d 278, 283 (R.I. 1999) (determining that a municipality was not estopped from shutting down operations at an asphalt plant where a building official erroneously and not in compliance with city town ordinances issued an operating permit).
Therefore, even if the elements of estoppel were present in the instant matter, a review of the relevant Cumberland Zoning Ordinances would not support a claim for estoppel SeeAlmeida, Beattie, Pezza, supra. First there is reliable, probative and substantial evidence that the Larivieres are operating a kennel out of their home. Article 10-69 of the Municipal Code defines a kennel as, "[a] commercial operation that (a) *Page 14 
provides food and shelter and care of animals for purposes not primarily related to medical care or (b) engages in the breeding of animals for sale." Mrs. Lariviere herself testified that she housed up to nine dogs at a time up to seven nights a week. (Tr. at 28.) It is also undisputed that she did so for a fee. Not only are kennels not allowed to be operated in the residential zone in which Yolonda's is located, but § 4-198 of the Municipal Code mandates that those operating kennels must receive a license to operate. Appellant is not in possession of such a license.
Also, § 5-1(e) of the Zoning Ordinance mandates that any valid home occupation must be limited to "20 percent of the general floor area in the dwelling unit or not more than three hundred (300) sq. ft., whichever is less." In her testimony, Mrs. Lariviere admitted that the 860 square foot addition was devoted to the business. (Tr. at 30.) Beyond that, she also testified that dogs frequently go out in her yard for exercise. (Tr. at 28.)
The Zoning Board of Appeals had before it competent evidence that Appellants were operating a business in contravention of the applicable municipal ordinances. Thus, even a valid claim which met the requisite elements of estoppel would fail. The Board's upholding of the Cease and Desist Order was properly issued to the Appellants who were in clear violation of the Zoning Ordinance, and the Board's Decision was not affected by error of law or an abuse of discretion. *Page 15 
 Conclusion
This Court has reviewed the entire record before it. Having done so, this Court is satisfied that the Decision of the Zoning Board is supported by the reliable, probative, and substantial evidence is not an abuse of discretion, clearly erroneous, or affected by error of law. Substantial rights of the Appellants have not been prejudiced. Counsel shall submit the appropriate judgment for entry.
[1] It should be noted that according to the Zoning Officer, the construction of the stockade like fence was done without the proper permit and unbeknownst to the Town. As the Zoning Officer placed on the record, "[w]e have no record of the permit for a fence being constructed on that property. (Tr. at 75.)
[2] Although the court in Greenwich Bay found affirmative action on the part of CRMC that could have induced petitioner to rely, it stopped short of invalidating CRMC's choice of criteria by way of estoppel. The matter was remanded so that a "declaratory ruling could be rendered from the full membership of the CRMC" on which set of criteria was to be applied. Greenwich Bay,537 A.2d at 993.
 *Page 1